IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | |
|---|---|
| Darwin Tyrell Kelly,<br><br>      Plaintiff,<br><br>vs.<br><br>Jovanny Jeremiah Quiles, Allstate Fire and Casualty Insurance Company and Direct General Insurance Company a/k/a National General, an Allstate Company, and State Farm Mutual Automobile Insurance Company<br><br>      Defendants. | C/A No. 5:25-cv-07826-JDA<br><br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT** |

**TO:    THE ABOVE-NAMED DEFENDANTS:**

The Plaintiff, complaining of the Defendants above-named, hereby alleges and pleads as follows:

1. Plaintiff is a resident of the County of Dorchester, South Carolina.

2. Upon information and belief, Defendant Jovanny Jeremiah Quiles (hereinafter "Quiles") is a resident of Saint Johns, Florida.

3. Defendant Allstate Fire and Casualty Insurance Company (hereinafter "Allstate"), is an insurance company located in and doing business in the State of South Carolina.  At the time of this accident Plaintiff and his lawful spouse had coverage on two vehicles with Allstate.

4. Defendant Direct General Insurance Company a/k/a National General, an Allstate company (hereinafter "Direct General"), is an insurance company located in and doing business in the State of South Carolina.  At the time of this accident, Quiles had automobile coverage with Direct General.

5. Defendant State Farm Mutual Automobile Insurance Company (hereinafter "State Farm") is an insurance company located in and doing business in the State of South Carolina. At the time of this incident, Plaintiff and his lawful spouse, carried auto coverage with State Farm on an additional two vehicles that carry both uninsured and underinsured motorist coverage.

6. At all relevant times hereto, the most substantial part of the acts and omissions occurred in Orangeburg County, South Carolina, that being the underlying motor vehicle collision.

7. The parties, matters and all things and matters hereinafter alleged are within the jurisdiction of this Court.

8. Prior to the accident, Kelly had obtained automobile insurance with Allstate. Kelly spoke with an agent and told her he wanted "full coverage". The agent explained there was some coverage he was not required to have and Plaintiff agreed to sign paperwork declining paperwork he was not required to have. While Plaintiff is not contesting whether a meaningful offer of UIM was made, or not, Kelly did not appreciate that the coverage he was declining was underinsured coverage, or otherwise, did not appreciate the purpose of the coverage he was declining. He just knew he was declining coverage he wasn't required to have.

9. On October 12, 2024, Plaintiff Darwin Tyrell Kelly (hereinafter "Kelly") was operating his vehicle South Bound on Interstate 95 in or near the town of Bowman, South Carolina.

10. Defendant Quiles was traveling North Bound on Interstate 95 in or near the town of Bowman, South Carolina at speeds at or above 70 mph and, in

failing to keep his vehicle on the road, he drove his vehicle off the interstate, across the median, and while driving on the wrong side of the interstate, he collided with the Plaintiff's vehicle causing a collision to the left front driver's side of the Plaintiff's vehicle.

11. The negligent acts of Defendant Quiles caused the vehicles to collide with great force causing serious injury to the Plaintiff.

12. Plaintiff has had to endure several surgeries and has incurred over $500,000 in medical bills due to this horrific collision caused by Quiles.

13. Defendant Quiles owed a duty to Plaintiff to operate the vehicle safely, with reasonable care, and in accordance with all laws concerning the operation of a motor vehicle.

14. Due to the severity of the collision and the severity of injuries to Defendant Quiles, authorities were unable to locate any evidence of insurance at all, regarding Defendant Quiles' insurance coverage, thus, leaving that section blank on the accident report. See attached Accident Report, Ex. A.

15. Upon information and belief, Quiles suffered a head injury in the collision that has affected his competency. After the collision Quiles was hospitalized in South Carolina.

16. Simultaneously therewith, both of Plaintiff's legs were seriously injured, requiring Plaintiff to be heavily medicated, and/or recovering from multiple surgeries. While Plaintiff was not fully incapacitated, Plaintiff's severe injuries left him severely limited in terms of his ability to communicate regarding issues of his own insurance coverage. For instance, as of December 4, 2024, Plaintiff Kelly

went back into Trident Hospital for his tenth surgery.

17. Upon information and belief, Defendant Quiles was being discharged from the South Carolina hospital, possibly to continue receiving care in Florida, and it became incumbent upon Plaintiff to file suit quickly to attempt to have Quiles served in order to determine what insurance was available and to subject to the jurisdiction of the Court.

18. Plaintiff filed suit against Quiles in Orangeburg Circuit Court on November 14, 2024.  Plaintiff was not able to properly serve Defendant until December 6, 2024, at which time the process server confirmed to Plaintiff that Quiles had suffered a severe head injury.

19. On or about October 20, 2024, Plaintiff met with Plaintiff's counsel at his home.  Plaintiff Kelly was heavily medicated and in pain.  Plaintiff Kelly was sleeping day and night in a hospital bed installed in his living room, with both legs immobilized.  At the time of that meeting, and given his condition, Plaintiff Kelly was not aware that the coverage he had previously declined was "underinsured" coverage.

20. When asked for information about his UIM coverage, Plaintiff Kelly provided a screen shot of an Allstate Insurance card.  The card provided the policy number, the name of the insured, the effective date, and the type of vehicle covered.  The card provided no details about coverage amounts or whether UIM was available. See Ex. B, redacted 10/20/24 email from Plaintiff to Plaintiff's counsel, re: UIM.  The lack of information on the insurance card, coupled with Kelly's injuries and medications, coupled with Kelly not having an appreciation that

he had previously declined "underinsured motorist" coverage, led to a miscommunication, and misunderstanding, about the same.

21. On December 2, 2024, Direct General, the liability carrier for the Defendant Quiles, wrote a letter to Plaintiff's counsel confirming that, at the time of the accident, Quiles had no Bodily Injury Liability coverage, under his Florida policy, which would cover Plaintiff Kelly's bodily injury coverage, and that Quiles had only $10,000.00 in property damage coverage. Direct General denied that it "should" to conform its policy limits to SC minimum limits, but that Direct General would agree to pay $25,000.00 in liability and $25,000.00 in property damage, in order "to resolve this matter", in exchange for a Covenant Not to Execute. While Direct General did pay the $25,000.00 in bodily injury coverage, on December 17, 2024, it never paid Plaintiff the property damage, and a Covenant Not to Execute was never signed.

22. On or about December 5, 2025, Plaintiff served Allstate twice. The first service letter to Allstate, was through the SC Department of Insurance, and was served on Allstate, as the Uninsured Motorist ("UM") carrier, with a copy of the November 14, 2024, Complaint, pursuant to SC Code §38-77-150. See Ex. C, 12/5/25 UM Allstate Service Letter. The second service letter to Allstate, was through the SC Department of Insurance, and was served on Allstate, as the Underinsured Motorist ("UIM") carrier, with a copy of the November 14, 2024, Complaint, pursuant to SC Code §38-77-160. See Ex. D, 12/5/25 UIM Allstate Service Letter.

23. Service on Allstate as both UM and UIM carrier for Kelly, was

consistent with Plaintiff counsel's previous correspondence to Allstate, calling it both the UM/UIM carrier for Plaintiff Kelly.  Allstate never provided a declarations page or communicated to Plaintiff, or Plaintiff's counsel, that Kelly had previously rejected UIM coverage.

24.     On or about December 9, 2024, an adjuster for Allstate left a voice message and telephone number with a request for Plaintiff's counsel to communicate with Allstate by phone.  Plaintiff's counsel explained that the claim was submitted as both a UM/UIM policy and had served Allstate under both statutes.  Allstate did not inform Plaintiff's counsel that there was no UIM coverage and told Plaintiff's counsel that Allstate was filing the claim as a UM claim.

25.     On that same date, Plaintiff's counsel provided Allstate, by email with the UM service letter, because Allstate had verbally confirmed that it would classify the claim as a UM claim, instead of a UIM claim.

26.     On that same December 9, 2024, email Plaintiff's counsel provided Allstate with Plaintiff's bill for Trident Hospital, for services rendered through mid-October, 2024, which totaled $436,699.00.  Mr. Kelly went through multiple additional leg surgeries and doctors visits afterward, and was unable to work during this time.  Mr. Kelly's damages at this time were well in excess of $500,000.00.  Kelly's new Ford F-150 and its contents were completely totaled, lost, and destroyed.

27.     On December 11, 2024, Allstate Insurance tendered the full available bodily injury and property damage limits under the uninsured policy ($25,000/50,000/$25,000.00) Kelly and $25,000/50,000/$25,000.00 to wife) to

Plaintiff. This amount was $100,000.00, which consisted of BI limits of $50,000.00 (single BI limits of $25,000.00, stacked between two vehicles) and $50,00.00 in property damage coverage (single PD limits of $25,000.00, stacked between two vehicles). No formal settlement agreements have been executed by either party. The settlement monies Allstate tendered to Plaintiff is being held in trust with Plaintiff's counsel.

28. On December 17, 2024, Direct General tendered Defendant Quiles' the bodily injury settlement payment of $25,000.00. No property damage money was paid in any amount. This money was deposited in trust with Plaintiff's counsel and remains there. No formal settlement agreements have been exercised by either party.

29. At the time that Allstate tendered its monies, Plaintiff Kelly didn't appreciate the difference between uninsured and underinsured coverage, and did not appreciate that the coverage he had previously declined, was underinsured motorist coverage.

30. Given the severity and amount of Plaintiff's injuries and damages, if Quiles was uninsured at the time of the accident, Allstate would have owed all uninsured policy limits. Likewise, given the severity and amount of Plaintiff's injuries and damages, if Quiles was statutorily insured with South Carolina minimum limits at the time of the accident, and if Kelly had elected underinsured motorist coverage in the same limits as his uninsured, then Allstate would have owed the same amount.

31. At that time Allstate tendered its monies to Plaintiff had still never

informed Plaintiff or Plaintiff's counsel that there was no underinsured motorist coverage or provided a declarations page.

32. On March 20, 2025, counsel for Allstate sent a letter to Plaintiff's counsel asserting that Allstate had overpaid, since there was no UIM coverage, and since it took the position that Quiles was fully insured, due to Direct General's settlement letter, and that Allstate's UM payments should be returned.

33. This was the first time Kelly had been informed by Allstate that there was no UIM coverage since the accident had occurred, and since serving Allstate with a copy of the Quiles suit, pursuant to SC Code §38-77-160.

34. On March 21, 2025, Plaintiff Kelly researched his Allstate portal file and found his UIM selection/rejection form, rejecting UIM coverage for the involved Kelly vehicle, and provided that to Plaintiff's counsel. See Ex. E, 3/21/25 email from Plaintiff Kelly to Plaintiff's counsel, providing Allstate UIM selection/rejection form.

35. At this time Plaintiff was recovering from his injuries, and was not as heavily medicated. It was not until March 21, 2025, that Plaintiff appreciated that the coverage he had declined, was what was now being referred to, after his accident, as underinsured motorist coverage.

36. Plaintiff maintains that Defendant Quiles was literally uninsured at the time of the accident, that Direct General did not believe it had a legal obligation to reform Quiles policy limits to South Carolina minimum limits, but offered to pay (and did pay) $25,000.00 in bodily injury coverage and offered to pay (but did not pay) $25,000.00 in property damage coverage, to settle Plaintiff's claims.

37. Plaintiff also maintains that if Quiles was not legally required to maintain South Carolina minimum limits coverage at the time of the accident, then then it is undisputed that he is legally uninsured, no matter the voluntary settlement payments that his carrier made to resolve his claims.

38. Plaintiff has also named State Farm Insurance Company, as there are two more vehicles insured by Plaintiff and his spouse, and titled in the name of Plaintiff and his spouse, which also have minimum limits coverage of $25,000.00/$50,000.00/$25,000.00, and if Plaintiff is entitled to UM coverage, that these policies should be stacked as well.

## **FOR A FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

39. The foregoing paragraphs of this Complaint are reaffirmed and realleged.

40. There is a contract of automobile insurance between Plaintiff and Allstate, and State Farm. The allegations contained above are ripe for judgment by the court pursuant to SC Code Sec. 15-53-10, the Declaratory Judgment Act.

41. Kelly is entitled to declaratory judgment on the following issues:

a. The at-fault driver, Quiles, was an uninsured driver at the time of the collision, and was not required to maintain South Carolina minimum limits, such that Kelly is entitled to retain the Underinsured Monies paid by Allstate;

b. Determination that the tender of available Uninsured limits by Allstate to Kelly was proper;

c. Determination that Direct General was not required by South Carolina

      law to reform the Quiles Florida policy to South Carolina policy limits, thus rendering Quiles legally uninsured;

d. That Direct General's payment of $25,000.00 in bodily injury monies was the payment of a doubtful and disputed claim, which does not render Quiles fully insured under South Carolina law, such that Quiles should be deemed uninsured and Allstate and State Farm's uninsured limits should be available for Kelly;

e. Allstate disagrees with this position and the matter is ripe for determination by this Court.

f. Kelly is entitled to a determination of the full rights and remedies available to all parties, under the facts of this case and all monies entitled to be retained by Kelly.

g. That State Farm's automobile insurance policies under the name of Tyrell and his resident spouse, Thomasena Kelly, for vehicles titled in their names, should also be stacked and should be available to Plaintiff.

**WHEREFORE**, Kelly prays for Declaratory Judgment relief as set forth above and for any other just and equitable relief as may be deemed appropriate by the trier of fact, including both attorney's fees and reasonable costs under any legal or statutory provisions applicable, and that the Court's determination should end this action and that the underlying Kelly v. Quiles automobile lawsuit be allowed to proceed.

BREWER LAW FIRM, LLC

*/s/ Barrett R. Brewer*

_____
Barrett R. Brewer, Esq. – Fed. Bar #8081
P.O. Box 1847
510 Mill Street #2B (29464)
Mount Pleasant, SC 29465
o: (843) 779-7454
f: (843) 779-7456
e: barrett@brewerlawfirmsc.com
Attorney for the Plaintiff

November 5, 2025
Charleston, South Carolina